**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

           **v.**                                    **1:05-CR-14**
                                                      **(GLS)**

**MAURICE D. MILLER,**

                      **Defendant.**

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY            Carlos A. Moreno
United States Attorney           Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

HON. ALEX T. BUNIN              Paul J. Evangelista
Federal Public Defender         Assistant Federal Defender
39 North Pearl Street, 5th Floor
Albany, New York 12207

**Gary L. Sharpe**
**U.S. District Judge**

## Decision and Order

### I. Introduction

Maurice D. Miller has been indicted for possession of a handgun and

ammunition, and possession with intent to distribute crack and powder cocaine. He moves to suppress the warrantless seizure of evidence from his person and vehicle, and statements he made to local police officers. *See Dkt. No. 10*; FED. R. CRIM. P. 12(b)(3)(C). The motion to suppress physical evidence is denied in its entirety, and the motion to suppress statements is granted as to one of six, and otherwise denied.

Preliminarily, this decision is, in part, the logical extension of several observations made by this court in *United States v. Elliott*, 363 F. Supp. 2d 439 (N.D.N.Y. 2005). Suppression analysis is difficult absent a clear understanding of the precise issues, and parties should take care in their stipulations or motions to identify those issues. To achieve that goal, there must be sufficient factual disclosure during discovery, and, depending on the circumstances, the government may have to file a notice of intention to offer evidence. *See* FED. R. CRIM. P. 12(b)(4). However, just as the court cautioned in *Elliott*, the attorneys have adhered to past practice. *See Elliott*, 363 F. Supp. 2d at 446. They may well have made tactical judgments regarding the issues they elected to raise. Regardless, they could not reasonably have anticipated all of the issues the court now considers, especially since *Elliott* was not published when this motion was

filed.

## II.  <u>Decision Summary</u>

The parties have raised many Fifth and Fourth Amendment claims, but there are preliminary and substantive issues they have not addressed. Since all issues are pertinent to this motion and equally important to future motions by similar litigants, the court considers each.

The preliminary issues are: (1) the standard of proof; (2) the burden of proof; (3) the admissibility and weight of particular suppression hearing evidence; (4) whether federal or state law governs the substantive analysis ("choice of law"); and (5) the extent to which parties waive issues not raised.

The Fifth Amendment issues are: (1) the application of *Miranda v. Arizona*, 384 U.S. 436 (1966) to various custodial and non-custodial statements; (2) the public safety exception to *Miranda* (*see New York v. Quarles*, 467 U.S. 649 (1984)); (3) the voluntariness of a *Miranda* waiver, and, under due process standards, of the statements themselves; and (4) whether statements are tainted by impermissible searches or other inadmissible statements.

The Fourth Amendment issues are: (1) an arrest in terms of probable

3

cause, custody and good faith reliance on a warrant; (2) exceptions to the

search warrant requirement, including an inventory search, a search of a

person and vehicle as incidental to an arrest, and the automobile and plain

view exceptions; (3) inevitable discovery; and (4) the defendant's

expectation of privacy ("abandonment").

The facts surrounding these issues are critical to Miller's motion, and

Rule 12 requires the court to state its essential findings.  *See* FED. R. CRIM.

P. 12(d).  Accordingly, the court first recites the facts, followed by a

discussion of the motion's procedural history and the parties' submissions,

and concludes with a consideration of the preliminary and substantive

issues.

### III. <u>Facts</u>

Having considered the testimony of Watervliet police officers Morrow,

Ellis and Murray, thirteen exhibits, a Miller affidavit, and the parties'

submissions, and having resolved issues of credibility, the court finds the

following essential facts.  *See* FED. R. CRIM. P. 12(d); *see also infra* Part

V.A-C. (Standard and Burden of Proof and Evidentiary Considerations).

Running a red light is a traffic offense in violation of Watervliet City

Ordinance § 260(4) and New York State Vehicle and Traffic Law §

4

1111(d)(1) and (2)(a).  Patrolman Morrow was a Watervliet police officer authorized to enforce the Watervliet and New York traffic laws.

At 10:45 P.M. on December 21, 2004, Patrolman Morrow saw Miller's car run a red light in Watervliet.[1]  Miller was the sole occupant and registered owner of the car.  Morrow radioed Miller's plate number to headquarters, and followed Miller for a short distance.  Within three minutes, Morrow activated his marked patrol car's emergency lights, and signaled Miller to pull over.  Miller complied by double-parking in front of 216 23rd Street.  Thus, the encounter between Morrow and Miller began as a routine traffic stop.

Consistent with standard and reasonable police procedures, Morrow approached Miller's driver's side window, spoke with Miller about the reason for the stop, and requested his license, registration and insurance information.  Miller produced the information, and told Morrow that he believed he had been stopped for making a U-Turn, that he was headed to his cousin's house, and that his cousin was Donald Lewis.  ("First Statement").  Miller's statement was prompted by a non-custodial Morrow

---

[1]The court discredits Miller's non-testimonial denial.  *See infra* Part V.C. (Evidentiary Considerations).

question.

While Morrow was at Miller's driver's side door, Miller's cousin, Lewis, a pedestrian on the contiguous sidewalk, approached the car several times. Morrow recognized Lewis as a member of the Bloods, a violent street gang associated with drugs and guns. Each time Lewis approached, Morrow ordered him away. After obtaining Miller's license, registration and insurance information, Morrow returned to his car to run a license check. Lewis again approached Miller's car, and Morrow exited his vehicle and ordered him away.

Morrow reentered his car and radioed for back-up because he was nervous about Lewis' intervention. Contemporaneously, he used the patrol vehicle's computer to run a license check on the New York State Police Information Network ("NYSPIN"), and learned that there was an outstanding Troy, New York warrant authorizing Miller's arrest. Morrow then contacted his dispatcher to verify that the Troy warrant was active. "Verification" is a Watervliet Police Department policy, and its purpose is to confirm that the "warrant issuing jurisdiction" still wants the subject.

Within seconds of Morrow's conversation with the dispatcher, the back-up, Ellis, and the shift commander, Lieutenant Murray, arrived almost

6

simultaneously.  As they did so, Morrow exited his patrol car, approached Miller's driver's side window, and ordered Miller to exit the vehicle. Approximately five minutes elapsed from the time Miller was stopped until Morrow issued his order.  When Morrow issued the order, Miller was no longer free to terminate the encounter, and it escalated from routine traffic stop to custodial arrest.

Miller's arrest was based on the outstanding Troy warrant.  Morrow believed that he was without authority to arrest Miller absent warrant confirmation.  *Suppression Hearing Transcript ("T."), p. 93, Dkt. No. 10*. While Watervliet policy supported Morrow's subjective belief, New York law authorized Morrow to arrest Miller.  *See infra* Part VI.A.

After Miller exited his car, Morrow led him to the rear of the vehicle, where Ellis was then standing.  Again, Lewis attempted to approach the car, and was instructed to move away.  After he complied, Ellis walked over, told him not to interfere, and warned him that he would be arrested if he continued to do so.

From the beginning of the five-minute interval between the traffic stop and custodial arrest, and until Ellis' subsequent conversation with Lewis, Miller engaged in repeated conversations with Lewis.  In essence, Miller

loudly requested that Lewis, or through Lewis' intercession, Miller's wife, take possession of the vehicle.  (Collectively, "Second Statement").  Miller's pre- and post-custodial second statement to Lewis was spontaneous and not prompted by police interrogation.

While at the rear of Miller's car and after Miller's arrest, Morrow searched Miller's person and clothing.[2]  Morrow seized Miller's wallet, car keys, a separate set of odd-shaped keys, and cash.  Morrow then handcuffed Miller, and left him in Ellis' custody at the rear of the vehicle. Contemporaneously, the dispatcher radioed that the Troy warrant was active.

Consistent with a written Watervliet police policy and standard operating procedure, Morrow and Murray ordered Miller's car impounded, requested a tow truck and began an inventory search.  The inventory did not begin until after Miller's arrest.  The Watervliet Police Department routinely employs inventory procedures when an unattended vehicle accompanies a custodial arrest.  Although Miller disputes the clarity of the written policy, the court finds that it specifically supports the testimony of

---

[2]Although Morrow testified that he "frisked" Miller for weapons, that terminology is typically associated with a *Terry* stop.  *See Terry v. Ohio*, 392 U.S. 1 (1968).  While Morrow may have initially "frisked" Miller, it is clear that he conducted a more intrusive search of Miller's person and clothing.

Morrow and Murray.  *See Watervliet Police Department, General Order, Inventory Policy, Gov't Ex. 1, Dkt. No. 11.*  While a literal reading of selected portions may support an argument that a vehicle should be inventoried *after* it is towed, the credible testimony and the document in its entirety support the contrary conclusion that vehicles are generally inventoried prior to towing.  Furthermore, and regardless of whether a vehicle is inventoried before or after it is towed, the written policy authorizes an inventory.  Both the written policy and standard operating procedure require that officers inventory all closed containers within the vehicle.  *Id.* at § II.1.B.8.  It was inevitable that had the inventory occurred at the station instead of roadside, the same areas and closed containers would have been searched.

Consistent with the inventory policy and standard procedures, Morrow conducted the actual inventory while Murray recorded the results. Morrow began the inventory from the driver's side door, and then walked to the passenger side door.  When he opened the glove box, a knife and sheath fell from the box, and he then discovered a loaded .45 caliber magazine in the box.  He also retrieved a cell phone, papers, envelopes, and clothing from the front passenger compartment.  *See Gov't Ex. 3*

*("Inventory List")*.

When Morrow and Murray began the inventory, Ellis' suspicions were aroused concerning the vehicle contents because of the behavior of Miller and Lewis.  Accordingly, he asked Miller, "if there was anything in the vehicle we should be concerned about, was there any drugs, any pot, any weapons." T. 110, 112.  Miller responded that "[t]here's a .45 caliber clip in there[,]" referring to the front passenger compartment where Morrow was then conducting his inventory search.  T. 112.  ("Third Statement").  The non-*Mirandized* third statement was prompted by custodial interrogation.

At the time Ellis asked Miller the question prompting the third statement, Ellis had been told of the potential danger posed by Lewis as a violent gang member.  However, he refrained from putting Miller in his patrol car because he wanted to see and hear Miller's reaction when Morrow and Murray searched the car.  Ellis testified that when he asked the question, he had no concern for public safety since three uniformed, armed police officers were on the scene, Lewis had been warned not to interfere and had retreated, and Miller was in handcuffs and subject to Ellis' control.

After completing the interior inventory, Morrow turned to the trunk.

As he unlocked it, Miller, in sum and substance, spontaneously stated without police interrogation: "The coat, the coat, the safe, the lock box or shoe box isn't mine."  ("Fourth Statement").[3]

Following Miller's fourth statement, Morrow opened the trunk and observed loose items and a locked safe.  As to the loose items, Morrow retrieved, *inter alia*, a coat, a shoe box containing Nike sneakers, a stereo receiver, and books.  *See Inventory List*.

After inventorying the loose items, Morrow turned to the safe and noticed that it had an odd locking mechanism.  Remembering the odd-shaped keys retrieved from Miller's clothing, he used them to open the safe.  In the safe, he discovered, *inter alia*, a loaded Jennings 9 millimeter handgun, numerous empty plastic baggies, baggies containing powder and crack cocaine, empty envelopes, a spare key for the safe, and a small digital scale.  *See id.*

After the handgun was discovered, Watervliet investigator Watson was contacted to process the scene, and Miller was placed in Ellis' car.  At that point (11:11 P.M.), and for the first time, Miller was advised of each of

---

[3]Miller repeated the disclaimer of ownership in his motion affidavit.  That denial is consistent with his statement during the police encounter, and the court credits the substance of his disclaimer.  Naturally, the court need not resolve whether his disclaimer is actually true for purposes of these proceedings.

his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and as reaffirmed by *Dickerson v. United States*, 530 U.S. 428 (2000). The warnings were read verbatim to Miller by Ellis who utilized a standard police *Miranda* card that completely listed the necessary warnings. After Ellis read the warnings, Miller stated that he understood each of them. Ellis concluded the warnings with the question "Having these rights in mind, do you wish to talk to us now?", and Miller responded "Yes." Miller appeared upset about his arrest, but behaved as a gentleman at all times, responded appropriately, appeared to understand his rights, and exhibited no signs of alcohol or narcotics consumption. Miller offered no evidence suggesting that the police failed to advise him of his *Miranda* rights or that he failed to comprehend them. Miller voluntarily waived his *Miranda* rights and agreed to speak with Ellis. There was no unreasonable coercion, pressure or deception employed by Ellis to induce the waiver.

Although Miller replied that he would answer questions, Ellis initially asked him none. As they sat in Ellis' patrol car, Miller saw Watson walk across the street with the coat taken from Miller's trunk, and spontaneously stated: "What's he doin' with my jacket? What's he doin' with my coat?" ("Fifth Statement"). Ellis then asked Miller what he had said, and Miller

12

responded: "My coat, why is he takin' it?"  Referring to Miller's earlier statement that the coat was not his, Ellis said "I thought you said it wasn't your coat?", to which Miller replied: "I said 'the' coat."  After a second exchange which, in sum and substance repeated the first, Miller became increasingly upset.  Ellis told Miller that he should remain calm and cooperate with the investigators, and Miller responded: "Yeah, I know, you got me, I am gonna serve some time."  (Collectively, "Sixth Statement").  Miller's fifth statement was spontaneous and not in response to police interrogation, but his sixth statement was in response to Ellis' custodial interrogation.  Both statements followed a voluntary *Miranda* waiver.

Thereafter, Ellis transported Miller to headquarters, and Morrow and Murray completed the inventory.

The Troy warrant was issued by a New York State Judge in connection with a charge of Assault in the Third Degree, a misdemeanor under New York law.  *See Gov't MOL, pp. 3, 7; Dkt. No. 11*.  Indisputably, the warrant was active.  Troy and Watervliet are located in adjoining counties.  Morrow later issued traffic citations to Miller for operating without insurance and running a red light.  Miller did not consent to any search nor did he consent to have his vehicle towed.

13

All six statements were voluntary within the meaning of the Fifth Amendment Due Process Clause, and Miller has never specifically raised or litigated this issue.  In any event, the statements were knowingly and intelligently made without any unreasonable physical or mental coercion, pressure, duress or deception employed by Morrow or Ellis to induce them. While Miller was suffering the strain associated with a police confrontation, he behaved normally and exhibited no verbal or non-verbal signs indicating that he failed to comprehend his situation or, post-*Miranda*, his rights.

### IV. <u>Summary of the Motion and Suppression Submissions</u>

Consistent with this district's standard Criminal Pretrial Order ("CPO"), Miller's motion sought suppression of "all evidence and statements obtained in violation of [his] 4th and 5th Amendment privileges."[4]  *See Evangelista Aff., ¶ 3, Dkt. No. 10*.  In support, he filed a personal affidavit, an attorney affirmation and a legal memorandum.  *Dkt. No. 10*.  Factually, he cited his personal knowledge, a review of discovery materials and conversations with the government, but did not reference a government notice of intention to offer evidence.  That notice was required

---

[4]Miller opted to proceed by formal motion rather than by stipulation.  *See Elliott*, 363 F. Supp. 2d at 435.

by the federal and local rules, and by the CPO.  Its function is to advise the

defendant of his statements and other tangible evidence that the

government intends to offer in its case-in-chief, thereby permitting the

defendant to file appropriate suppression motions.  *See Elliott*, 363 F.

Supp. 2d at 443.

In any event, the facts supporting Miller's motion were, at best,

sparse.  Referring to an attached "oral admission report," *see Ex. B, Dkt.

No. 10*, he sought suppression of only his third and fourth statements,

claiming they were the result of non-*Mirandized* custodial interrogation.  He

did not acknowledge the existence of, nor seek to suppress, any of the

other four statements.  Furthermore, he never claimed that any of his

statements were involuntary under traditional due process standards.  He

specifically sought suppression of the items seized from his person and

car, citing the absence of search warrants.

Conceding warrantless searches, the government responded with a

legal memorandum reciting facts and arguments as justification for the

searches and the admissibility of some of Miller's statements.  *See Dkt. No.

11*.  Regarding the statements, the government focused on the

admissibility of the third and fourth, acknowledged the existence of the

15

second, but made no mention whatsoever of the first, fifth and sixth.  The

government also ignored traditional due process standards of

voluntariness.

Following a full exploration of the facts at the suppression hearing,

the court noted the government's failure to file a notice of intent, directed

that it do so, and granted the parties' request to then file supplemental

submissions.  The government filed the notice, and fully detailed all of

Miller's statements.  *See Dkt. No. 24.*  In the supplemental submissions,

neither party mentioned the unaddressed, additional statements.  *See Dkt.*

*Nos. 18-19, 25-26.*  In sum, Miller has never contested the traditional

voluntariness of all six statements, and has never contested the

admissibility of the first and second volunteered statements, or of the post-

*Miranda* fifth and sixth statements.  This may be a strategic decision, but if

so, the court has never been apprized of that decision.

Regarding the Fourth Amendment issues, Miller alleged that the

police engaged in warrantless searches of his person and vehicle, and that

he has "standing" to contest those searches.[5]  The government has argued

_____

[5]Although "standing" is no longer a viable component of Fourth Amendment analysis, courts and litigators continue to use the nomenclature.  *See Rakas v. Illinois*, 439 U.S. 128, 133 (1978), *discussed infra*, Part V.C.2.d. (Search of Coat and Safe (Expectation of Privacy and Abandonment)).

the following theories as exceptions to the Fourth Amendment warrant requirement: (1) there was probable cause to arrest Miller based on the Troy warrant; (2) the search of Miller's person and the interior of the car were justified as incidental to Miller's lawful arrest; (3) the search of the entire car and its contents was justified pursuant to the inventory exception; (4) the search of the trunk was justified pursuant to the automobile exception; and (5) Miller abandoned his right to contest the search and seizure of the coat and safe.

As this summary reflects, there are issues which neither party has raised or argued.  For example, Miller has never contended that any of his statements were generated by police coercion or any form of undue pressure, nor has he argued that an inadmissible statement taints subsequent statements.[6]  By the same token, the government has never argued, for example, that the seized evidence is admissible on the basis of inevitable discovery, or that the arrest on the basis of the Troy warrant is subject to a good faith analysis.  Consequently, the court must address whether the parties have waived issues they failed to raise.  *See infra* Part

---

[6]Miller argued that the statements were tainted by an illegal search.  *See Evangelista Aff., ¶ 15, Dkt. No. 10; Supp. MOL, p. 10, Dkt. No. 18.*

V.E. (Waiver).

## V. **Preliminary Issues**

While Rule 12(d) of the Federal Rules of Criminal Procedure requires the court to state its essential findings, it is silent as to the standard and burden of proof, the evidence the court may consider, and the choice of law governing the analysis.  Accordingly, the court first addresses those matters, and also whether the parties have waived issues neither raised nor litigated.

### A. **Standard of Proof**

In Fourth and Fifth Amendment litigation, and regardless of which party shoulders the ultimate burden, the standard of proof is constant, namely, proof by a preponderance of the evidence.  *United States v. Matlock*, 415 U.S. 164, 177 (1974) (Fourth Amendment); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (Fifth Amendment).

### B. **Burden of Proof**

Often, parties mistakenly ignore the burden of proof in their legal arguments.  Judges are no different than any other fact-finder required to resolve contradictions.  At times, competing claims may be equally credible, and the burden of proof resolves that conflict.  While the burden is

frequently self-evident, that observation is not always true in Fourth and Fifth Amendment jurisprudence.

As the party seeking to suppress, the defendant has the burden of production. *See, e.g.*, *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (Fourth Amendment); *Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (Fifth Amendment).  In this district, the defendant usually satisfies this burden in one of two ways.  He may file moving papers accompanied by an affidavit, based upon personal knowledge, setting forth facts which, if proven true, would entitle him to relief.  *Elliott*, 363 F. Supp. 2d at 444.  Alternatively, he and the government may agree that he has met his burden, specify the issues requiring resolution, and request a hearing.  *Id.* at 444-45.  If he fails to comply with either alternative, he does not satisfy his burden, there will be no hearing, and the evidence he seeks to suppress will be admitted at trial.  *United States v. De La Cruz*, No. 96-CR-0344, 1997 WL 196048, at *1 (N.D.N.Y. Mar. 18, 1997); *see also* 6 WAYNE R. LEFAVE, SEARCH AND SEIZURE § 11.2(a) (4th ed. 2004).

As to the Fourth Amendment, and with one exception, Miller has satisfied his burden of production by alleging that the police seized

evidence without a search warrant.  *See Arboleda*, 633 F.2d at 989.

Accordingly, the burden shifts to the government to prove that an exception

to the Fourth Amendment warrant requirement justifies admission of

evidence.  *See United States v. Jeffers*, 342 U.S. 48, 51 (1951).  Regarding

the exception, Miller has both the burden of producing and proving that he

had a reasonable expectation of privacy in the coat and safe.  He has failed

to do either.  *See infra* Part V.C.2.d. (Search of the Coat and Safe

(Expectation of Privacy and Abandonment)).

As to *Miranda* and the Fifth Amendment, Miller has satisfied his

burden of production by alleging custodial interrogation in the absence of

*Miranda* warnings.  *See Connelly*, 479 U.S. at 168-69; *Mathurin*, 148 F.3d

at 69.  However, and except to the extent the *Miranda* warnings influence a

consideration of voluntariness, he has failed to satisfy his burden of

production under traditional due process voluntariness standards because

he did not assert a specific factual basis contesting voluntariness.  *See*

*Mathurin*, 148 F.3d at 69.  Again, other than asserting the lack of *Miranda*

warnings, he has not alleged that his statements were otherwise

involuntary.  However, since Miller has alleged police custodial

interrogation in the absence of *Miranda* warnings, the burden shifts to the

20

government to prove *Miranda* voluntariness, either because there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or because Miller was properly *Mirandized* and waived his rights. *Lego*, 404 U.S. at 489; *United States v. Anderson*, 929 F.2d 96, 98 (2d Cir. 1991).

## C. Evidentiary Considerations

In support of his motion, Miller submitted an affidavit, but did not testify or call witnesses. In his affidavit, he denied running the red light, thus controverting the government's asserted basis for the initial police encounter. He also stated that initial police questioning was conducted pre-*Miranda*, that he did not consent to a vehicle search, and that he did not own the coat or items seized from the safe.

Evidentiary rules governing criminal trials do not apply to suppression hearings which are conducted to determine the admissibility of evidence in the first instance. *See Matlock*, 415 U.S. at 172-73; *accord* FED. R. EVID. 104(a), 1101(d)(1). Such evidence clearly includes hearsay. *See Matlock*, 415 U.S. at 172-73; *see also United States v. Marchand*, 564 F.2d 983, 992 n.18 (2d Cir. 1977). Obviously, an affidavit offered by the declarant is hearsay even if admissible because of some hearsay exception. *See* FED.

21

R. EVID. 801.

Under appropriate circumstances, a defendant's detailed affidavit is sufficient to warrant a suppression hearing. *See Mathurin*, 148 F.3d at 69. For example, the Circuit has required a hearing on the issue of standing where the only pre-hearing facts detailing the defendant's expectation of privacy were contained in an affidavit. *See United States v. Pena*, 961 F.2d 333 (2d Cir. 1992). While an affidavit may be sufficient to generate a hearing, the evidentiary weight to be afforded the affidavit is a different matter.

Clearly, a defendant has the right to testify at a suppression hearing, and his testimony is typically insulated because the prosecution cannot use it directly in a subsequent trial. *See Simmons v. United States*, 390 U.S. 377 (1968). While the court recognizes that tactical considerations may govern the defendant's decision to testify, *see Harris v. New York*, 401 U.S. 222 (1971); *United States v. Morales*, 185 F.3d 74, 84-85 (2d Cir. 1999); *United States v. Madkour*, 930 F.2d 234, 238-39 (2d Cir. 1991), he is nonetheless free to do so. Absent such testimony, a judge may consider the defendant's hearsay affidavit, but should "give it such weight as his judgment and experience counsel." *Matlock*, 415 U.S. at 175 (footnote

22

omitted).  Often, weight will be influenced by whether the affidavit is

contradicted by more cogent evidence, especially that which withstands the

scrutiny of cross-examination.

Based on the foregoing, and as already recited in the Facts, the court

discredits Miller's assertion that he did not run a red light, but credits his

assertion that he did not own the coat and safe.

### D. <u>Choice of Law</u>

Miller's arrest resulted exclusively from his encounter with local

police, and the only federal connection is the decision to prosecute in this

court.  Substantively, and particularly in the Fourth Amendment arena,

there are significant differences between New York and federal law.  Thus,

the court considers the appropriate choice of law.

The Supreme Court began a federalism dialogue in *Weeks v. United

States*, 232 U.S. 383 (1914), *overruled in part by Elkins v. United States*,

364 U.S. 206 (1960), *and in part by Mapp v. Ohio*, 367 U.S. 643 (1961),

when it first announced the Fourth Amendment exclusionary rule, but

limited its effect to evidence seized by federal officials in federal trials.

*Weeks*, 232 U.S. at 391-93, 398.  That limitation created the so-called

"silver platter" doctrine permitting federal use of evidence seized by state

authorities.  *See Elkins*, 364 U.S. at 208 n.2.  In *Wolf v. Colorado*, 338 U.S. 25 (1949), the Court extended the exclusionary rule to state courts when evidence was illegally seized by state officials.  In *Elkins*, the Court overruled *Weeks'* federal-state dichotomy, applying the exclusionary rule to all unlawful seizures whether by federal or state police officers.  *Elkins*, 364 U.S. at 208, 223-24.  In doing so, the Court stated: "[t]he test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."  *Id.* at 224.  A year after *Elkins*, the Court extended the exclusionary rule to Fourth Amendment violations by all police officers in state court.  *Mapp*, 367 U.S. at 655.  And federally, the Court limited the application of the exclusionary rule when it created the "good faith" exception in *United States v. Leon*, 468 U.S. 897 (1984).

It is now axiomatic that the Fourth Amendment exclusionary rule applies in all courts, regardless of who conducted the underlying investigation, as long as federal constitutional law governs.  However, it is also fundamental that on adequate and independent grounds, state courts are free to interpret their own laws and constitutions in order to impose more restrictive Fourth Amendment requirements than are federally

24

mandated.  *Arkansas v. Sullivan*, 532 U.S. 769, 772 (2001); *Michigan v. Long*, 463 U.S. 1032, 1041 (1983); *Sibron v. New York*, 392 U.S. 40, 60-61 (1968) ("New York is ... free to develop its own law of search and seizure ...."); *see also People v. Scott*, 79 N.Y.2d 474, 495-97 (1992).  New York has frequently done so.

Thus, New York limits *Terry* protective searches.  *Compare Terry v. Ohio*, 392 U.S. 1 (1968), *and Michigan v. Long*, 463 U.S. 1032 (1983), *with People v. Torres*, 74 N.Y.2d 224 (1989).  It has declined to adopt the *Leon* good faith exception, *compare United States v. Leon*, 468 U.S. 897 (1984), *and United States v. Smith*, 9 F.3d 1007 (2d Cir. 1993), *with People v. Bigelow*, 66 N.Y.2d 417 (1985), the *Gates* "totality of the circumstances" probable cause test, *compare Illinois v. Gates*, 462 U.S. 213 (1983), *and United States v. Rowell*, 903 F.2d 899 (2d Cir. 1990), *with People v. Griminger*, 71 N.Y.2d 635 (1988), *and People v. Johnson*, 66 N.Y.2d 398 (1985), and extends a greater expectation of privacy to vehicle interiors.  *See Torres*, 74 N.Y.2d at 229-31; *People v. Class*, 63 N.Y.2d 491 (1984), *rev'd sub. nom. New York v. Class*, 475 U.S. 106 (1986), *original decision reinstated on state law grounds foll. remand*, *People v. Class*, 67 N.Y.2d 431 (1986).  In New York, searches of closed containers or bags as an

25

incident to arrest or personal items within an automobile may be limited

unless accompanied by exigent circumstances.  *Compare People v.*

*Gokey*, 60 N.Y.2d 309 (1983), *People v. Belton*, 50 N.Y.2d 447 (1980),

*rev'd sub. nom. New York v. Belton*, 453 U.S. 950 (1981), *on remand*,

*People v. Belton*, 55 N.Y.2d 49 (1982), *People v. Torres*, 74 N.Y.2d at 229,

*People v. Carvey*, 89 N.Y.2d 707 (1997), *and People v. Mundo*, 99 N.Y.2d

55 (2002), *with Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (automobile

exception has no exigency requirement).  The inevitable discovery rule

may also be more limited.  *See Torres*, 74 N.Y.2d at 228 (citing *People v.*

*Stith*, 69 N.Y.2d 313, 316 n. (1987)).

Despite Miller's encounter with local police operating pursuant to

state law, New York's constitutional differences are irrelevant to this court's

analysis.  As the Supreme Court has stated, "[t]he question whether

evidence obtained by state officers and used against a defendant in a

federal trial was obtained by unreasonable search and seizure is to be

judged as if the search and seizure had been made by federal officers."

*Preston v. United States*, 376 U.S. 364, 366 (1964) (citation omitted); *see*

*Rowell*, 903 F.2d at 901-02; *United States v. Pforzheimer*, 826 F.2d 200,

203 (2d Cir. 1987).  Therefore, the court applies federal law.

26

### E. <u>Waiver</u>

Because the parties failed to raise certain arguments, the court

considers whether either has waived them as a basis to challenge or

support the admission of evidence.

The Federal Rules of Criminal Procedure address this issue.  Motions

to suppress must be made before trial, and a party waives any objection or

request it fails to raise.  FED. R. CRIM. P. 12(b)(3)(C) & (e).  Interpreting

Rule 12, the Circuit has held that the failure to raise a particular ground in a

suppression motion waives the right to challenge admissibility of evidence

on that ground.  *Indiviglio v. United States*, 612 F.2d 624, 630 (2d Cir.

1979) (citing, *inter alia*, *United States v. Rollins*, 522 F.2d 160 (2d Cir.

1975)).  Thus, the failure to challenge evidence on Fourth, Fifth or Sixth

Amendment grounds constitutes waiver.  *See United States v. Michalek*,

819 F. Supp. 250, 261-62 (W.D.N.Y. 1993) (citations omitted).

Appellate authority, common sense and Rule 12 dictate that waiver

principles may also apply to the government.  *See United States v. Harrell*,

268 F.3d 141, 146 (2d Cir. 2001).  Where a party has ample opportunity to

advance an argument, and fails to do so, it is waived.  *See id.*  This

conclusion reflects the simple proposition that absent omniscience, a court

cannot rule on claims parties fail to press.  This does not mean, however, that a court cannot consider unpressed, but relevant legal theories.  Occasionally, the court may discern an unarticulated, relevant theory, but ignore it because of an insufficient factual record.  Nonetheless, and always mindful that relevant evidence is admissible unless excludable for some valid purpose, the court may consider any theory as long as the record is sufficiently developed.

The court turns to the application of waiver principles, beginning with the defendant.  As to his statements and except for the impact of his *Miranda* claims, Miller has legally and factually failed to meet his burden of production regarding suppression on the basis of voluntariness under traditional Fifth Amendment Due Process standards.  Therefore, he has waived the right to do so.  *See Mathurin*, 148 F.3d at 69.  Legally, Miller has generically challenged all statements as having been obtained in violation of his *Miranda* rights, but legally and factually, he has failed to address the admissibility of his first, second, fifth and sixth statements.  He had ample opportunity to do so in his supplemental submissions which were filed after full factual disclosure at the hearing and after the government filed its notice of intent.  To a limited extent, he has

nonetheless met the waiver threshold and satisfied his burden of

persuasion by alleging at least a *Miranda* violation.  It is thus incumbent on

the government to establish the absence of custodial interrogation subject

to *Miranda*, some exception to *Miranda*, or that Miller was properly

*Mirandized* and waived his rights.  *See Lego*, 404 U.S. at 489; *Anderson*,

929 F.2d at 98.  Miller has waived his right to press a claim that a

statement obtained in violation of *Miranda* taints subsequent statements.

Nonetheless, and although the factual record is sparse, the court elects to

reach the merits of due process voluntariness and taint claims.

In the Fourth Amendment context, there is no waiver because Miller

has generally satisfied his burden of production by alleging warrantless

searches.  *See Arboleda*, 633 F.2d at 989.[7]

As for the government, it never sought to justify Miller's arrest based

upon Morrow's good faith reliance on the Troy warrant, confirmed or not.

Nor did the government argue inevitable discovery as justification for any

warrantless seizure.  Accordingly, it has waived its right to do so.

Nonetheless, the court elects to consider the merits of both since the

_____

[7]There is a question regarding whether Miller has satisfied his burden of proving an
expectation of privacy in the coat and safe, but he has not waived the argument.

factual record has been adequately developed.

## VI. Substantive Issues

The events leading to Miller's arrest, his statements and the seizure of items from his car and person are all intertwined.  However, the court begins with Miller's traffic stop and the escalating police encounter since his custodial status at the time of questioning and during the searches is critical to suppression analysis.

### A.  The Police Encounter and Miller's Arrest

While casual police-citizen contact does not implicate the Fourth Amendment's prohibition against unlawful seizures, any restraint of a citizen's liberty caused by a show of authority or force does.  *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *Terry*, 392 U.S. at 19 n.16).  To determine whether an encounter constitutes a seizure, a court must consider the totality of the circumstances and ascertain whether the police conduct would have communicated to a reasonable person that he was free to terminate the encounter.  *See id.* at 439.  Short of arrest, a citizen's movement may be restricted sufficiently to constitute a seizure, but the seizure may pass constitutional muster if based on a reasonable suspicion that the individual was engaged in wrongdoing supported by specific,

articulable facts.  *Terry*, 392 U.S. at 30-31.

Arrest is the maximum intrusion on personal liberty and is authorized if supported by probable cause.  *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).  Probable cause to arrest is determined by reference to the totality of the circumstances, and exists if the police have sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed.  *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) (citing *Gates*, 462 U.S. at 230-31).  The fact that the police mistakenly believe that they lack probable cause is irrelevant to whether it legally existed.  *Id.* at 239 (citing, *inter alia*, *Florida v. Royer*, 460 U.S. 491, 507 (1983) (plurality)).  Furthermore, the standard allows for police mistakes as long as the mistakes are "those of reasonable men, acting on facts leading sensibly to their conclusions of probability."  *Brinegar v. United States*, 338 U.S. 160, 176 (1949). Probable cause to search relies on the same *Gates* totality standard, but focuses on a different inquiry; namely, whether the facts and circumstances known to the police are sufficient to create a reasonable belief that evidence of a crime, or contraband, will be found in the place to be searched.  *See United States v. Gaskin*, 364 F.3d 438, 456-58 (2d Cir.

31

2004).

In summary, police seizures are constitutional when reasonable, and reasonableness "usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse*, 440 U.S. 648, 654 (1979) (internal footnotes and citations omitted).

As they relate to routine traffic stops, these principles have received considerable attention. Although brief, an automobile stop and the detention of its occupant constitutes a Fourth Amendment seizure subject to the reasonableness standard. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996); *Prouse*, 440 U.S. at 653-54. Reasonableness is established if a police officer, based on objective facts, has probable cause or a reasonable suspicion to believe that a vehicle or its occupant is subject to seizure for a violation of the traffic laws. *Prouse*, 440 U.S. at 654, 663; *see also Whren*, 517 U.S. at 814-16 (probable cause); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000) (reasonable suspicion). Absent an

objectively reasonable basis, a routine traffic stop is unconstitutional.[8]

*Prouse*, 440 U.S. at 663.

As the Supreme Court has observed, the most common police method of enforcing traffic regulations is acting upon observed violations. *See Whren*, 517 U.S. at 817 (citation omitted).  If the court credits police testimony that a violation was observed, that observation alone is sufficient to constitute probable cause, which then justifies the temporary detention of the motorist or, in other words, his seizure.  *Id.* at 818-19; *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Harrell*, 268 F.3d at 148; *United States v. Dhinsa*, 171 F.3d 721, 724 (2d Cir. 1999).  If the seizure is thus justified, it is irrelevant whether the police had some ulterior motive or "pretext" for the stop, since probable cause justifies the Fourth Amendment intrusion.  *Whren*, 517 U.S. at 810-13; *see Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (*per curiam*).  In fact, it is irrelevant whether the police would have stopped on the basis of the traffic violation itself.  *See Harrell*, 268 F.3d at 148; *Dhinsa*, 171 F.3d at 725.  While it may be true that actions beyond a brief detention to process the traffic violation

_____

[8]Random traffic stops may be constitutional under appropriate circumstances not at issue here.  *See, e.g.*, *Illinois v. Lidster*, 540 U.S. 419 (2004); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975); *cf. City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).

may require further Fourth Amendment balancing, the stop itself is

constitutional.  *Cf. Dhinsa*, 171 F.3d at 818; *Illinois v. Caballes*, 125 S.Ct.

834 (2005).  Regarding the length of detention during a traffic stop, the

Supreme Court has observed that normal processing, such as checking

licenses and registrations, is a permissible Fourth Amendment practice.

*Class*, 475 U.S. at 113, 115-16 (citing *Prouse*, 440 U.S. at 659).

In light of these principles, the court turns to the escalating encounter

between Miller and the police.  Officer Morrow first saw Miller illegally run a

red light.  Morrow followed him a short distance, activated his emergency

lights, and pulled him over.  Morrow approached Miller's window, engaged

in a brief conversation regarding the purpose of the stop, and obtained

Miller's licence, registration and insurance information.  Morrow then

returned to his vehicle, ran a check of Miller's pedigree information against

his computerized access to NYSPIN records, and learned that there was a

misdemeanor assault warrant from the City of Troy authorizing Miller's

arrest.

When Morrow saw Miller run the red light, he objectively and

reasonably possessed probable cause to initiate a routine traffic stop.  To

the extent that Miller argues he did not run the light, the court has

discounted his assertion, resolving the credibility issue in Morrow's favor.

To the extent that Miller, by innuendo, argues that Morrow had some

ulterior motive for stopping him, the court concludes that the stop was

motivated by the traffic violation.  In any event, even if Morrow had

subjective motivations, they were irrelevant since there was objective

probable cause for the stop.  Until Morrow received the NYSPIN hit, the

duration and scope of Miller's initial detention was entirely reasonable and

consistent with the normal processing of routine traffic offenses.

Once Morrow learned of the outstanding warrant, he returned to

Miller's vehicle, removed Miller, placed him under arrest, searched him,

handcuffed him, and turned him over to the watchful eye of Ellis at the rear

of the vehicle.  Unquestionably, Miller's brief traffic detention was converted

to a custodial arrest for purposes of the Troy warrant when Morrow

removed Miller from the car.  Considering the totality of the circumstances,

Morrow's conduct reasonably communicated to Miller that Miller was no

longer free to terminate the original, routine traffic stop.  Accordingly,

escalation from traffic stop to arrest was legitimate if reasonable and

predicated on probable cause.

A significant portion of Miller's suppression analysis relies on his

assessment of when he was arrested and what objectively reasonable information Morrow possessed at that time.  He argues that his custodial detention began when he was removed from the car, but that the police lacked probable cause to arrest him at that juncture.  *See Evangelista Aff., ¶ 13, Dkt. No. 10; Supplemental MOL, p. 2, Dkt. No. 18*.  He then argues that subsequent events occurred before his arrest.  *Supplemental MOL, pp. 5, 8, Dkt. No. 18; Reply MOL, p. 4, Dkt. No. 25*.  Obviously, he contends that he was arrested when removed from the car, but the arrest was invalid.  The validity of the arrest requires resolution of a factual component of the probable cause analysis, namely, whether Morrow possessed probable cause to arrest Miller for the outstanding Troy warrant before the Troy authorities confirmed that they still wanted him.  Citing *United States v. Towne*, 870 F.2d 880, 884 (2d Cir. 1989), Miller contends that confirmation was a necessary antecedent to probable cause.  The court disagrees.

The Circuit's *Towne* decision must be read in light of the subsequent decision of the Supreme Court in *Arizona v. Evans*, 514 U.S. 1 (1995), and of the Circuit in *United States v. Santa*, 180 F.3d 20 (2d Cir. 1999).  First and foremost, there is no dispute that the Troy warrant was valid.  That fact

36

alone distinguishes *Towne*, which considered the constitutional consequences of police actions following execution of an invalid warrant. *See Towne*, 870 F.2d at 883-84.  While the Circuit pointed to police efforts to confirm the warrant as a favorable factor in its probable cause analysis, *id.* at 884, *Towne* does not hold that confirmation is a necessary antecedent to an authorized arrest.  In fact, the Circuit, citing *DeFillippo*, 443 U.S. at 39-40, and *Leon*, 468 U.S. at 918-19, held that the only issue was the existence of probable cause to arrest and that regardless of the validity of the warrant, the police had acted with objective good faith. *Towne*, 870 F.2d at 885.

In *Evans*, the Supreme Court considered essentially the same factual issue as in *Towne*: namely, the constitutionality of police actions predicated on the execution of an invalid warrant.  *Evans*, 514 U.S. at 3-4.  Like *Towne*, the Court cited *Leon*, and held that police reliance on an invalid court-generated warrant was objectively reasonable and did not support the exclusion of evidence gathered after the arrest.  *Id.* at 15-16.  As to the objective reasonableness of the arrest, the Court cited the trial court's observation: "I think the police officer [was] bound to arrest, I think he would [have been] derelict in his duty if he failed to arrest."  *Id.* at 15

37

(alterations in original).

In *Santa*, the Circuit revisited the invalid warrant scenario.  180 F.3d at 22.  Relying on *Evans*, the Circuit held that police reliance on a court-generated invalid warrant entered in the NYSPIN system was objectively reasonable under *Leon. Id.* at 27.  Again, the Circuit cited police efforts to verify the validity of the warrant as a basis for the reasonableness of the police actions, *id.* at 24, but *Santa* does not hold that confirmation is a necessary precondition for an authorized arrest.

Numerous courts in this Circuit have adopted the proposition that probable cause to arrest exists on the basis of a computer hit where there is no evidence that the information contained in the computer was false or invalid.  *See, e.g.*, *Evans v. City of New York*, 308 F. Supp. 2d 316, 329-30 (S.D.N.Y. 2004); *McGuire v. City of New York*, 301 F. Supp. 2d 333, 337 (S.D.N.Y. 2004); *Mahase v. City of New York*, No. 96 CV  6105, 2000 WL 263742, at *3 (E.D.N.Y. Jan. 5, 2000); *Johnson v. Harron*, No. 91-CV-1460, 1995 WL 319943, at *9 (N.D.N.Y. May 23, 1995).

Remaining is the analytical impact of Morrow's concession that he lacked authority to arrest absent confirmation.  His testimony appears to reflect his understanding of Watervliet policy and state procedures.  The

38

court is in no position to consider Watervliet policy beyond Morrow's statement, since the parties have neither offered any proof in that regard, nor argued the issue. State law, however, does not support Morrow's conclusion.

At least one Circuit Judge has lamented that federal prosecutors are promoting unlawful state practices by bringing state-initiated prosecutions in federal court. *See Santa*, 180 F.3d at 30-31 (Newman, C.J., concurring). Citing *People v. Jennings*, 54 N.Y.2d 518 (1981), Judge Newman noted that as a matter of state law, an invalid arrest warrant may not serve as a basis for probable cause. *Santa*, 180 F.3d at 30-31. Nonetheless, he recognized that federal standards control federal prosecutions, regardless of who conducted the underlying investigation. *Id.*

*Jennings* is a statement of New York law regarding the effect of an invalid warrant. *Jennings*, 54 N.Y.2d at 520. In New York, and despite Morrow's observation to the contrary, an arrest pursuant to a warrant is authorized if the warrant is valid on its face, was issued by a court having jurisdiction of the crime and the person, and is predicated on probable cause. *Broughton v. State*, 37 N.Y.2d 451, 456-58 (1975); *Heath v. State*, 645 N.Y.S.2d 366 (4th Dep't 1996); *Boose v. City of Rochester*, 421

39

N.Y.S.2d 740, 746-47 (4th Dep't 1979); *see also* N.Y. CRIM. PROC. LAW, §

120.10 *et seq.* (McKinney 2004) (Warrant of Arrest).  Thus, correct

information in NYSPIN establishes probable cause.  *Moscatelli v.*

*Middletown*, 645 N.Y.S.2d 639, 640 (2d Dep't 1998) (distinguishing

*Jennings*, 54 N.Y.2d at 520).

As the court has already observed, Morrow's mistaken belief

concerning his authority is irrelevant.  *See Gagnon*, 373 F.3d at 239.

Furthermore, even if Watervliet policy requires confirmation, that policy

cannot alter the Fourth Amendment's probable cause analysis federally.

There may be various reasons for such a policy, including a department's

reluctance to effectuate a custodial arrest only to have the "wanting

agency" refuse pick-up.  Such pragmatic policy concerns are no part of the

probable cause equation.[9]

Accordingly, and for the reasons stated, when Morrow ordered Miller

from the car, Morrow possessed probable cause to arrest him on the basis

of the outstanding Troy misdemeanor warrant.  Furthermore, and since

federal standards control the analysis, there was an objectively reasonable

_____

[9]Also, Morrow may have been mistakenly referring to New York's warrant delegation
rules applicable to arrests in non-warrant issuing counties.  *See* N.Y. CRIM. PROC. LAW §
120.60 (McKinney 2004).  Troy and Watervliet are in adjoining counties, and the arrest was
authorized.  *See id.* at § 120.90(2) & (4).

and good faith basis for Morrow to act on the NYSPIN computer record.
*See Evans*, 514 U.S. at 15-16 (citing *Leon*, 468 U.S. at 918-19).

### B.  The Statements

Miller has only attacked his third and fourth statements, contending
that they were made in response to non-*Mirandized*, custodial
interrogation.  Although he has waived his right to seek suppression of the
remaining four, or to seek suppression of all six on traditional due process
grounds, or to argue that any other statement may be tainted by the third or
fourth, the court addresses the merits of all six.

Pursuant to *Miranda*, the police must advise a defendant of his rights
only if two preconditions are met: namely, custody and interrogation.
*Thompson v. Keohane*, 516 U.S. 99, 102 (1995).  Absent either, non-
*Mirandized* statements are admissible.  Custody is established if, in light of
the circumstances of an interrogation, a reasonable person would have felt
that he or she was not at liberty to terminate the interrogation and leave.
*Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004) (citing
*Keohane*, 516 U.S. at 112).  Temporary detention of a motorist during a
routine traffic stop does not constitute custody for *Miranda* purposes, and
statements made by the motorist are admissible.  *Berkemer v. McCarty*,

41

468 U.S. 420, 440 (1984).

Interrogation requires express questioning or its functional

equivalent, and includes:

> any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect ... A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.  But since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980) (emphasis in original).

The questions "must have been both likely to elicit an incriminating

response and to produce psychological pressures that will subject the

individual to the 'will' of the examiner."  *United States v. Morales*, 834 F.2d

35, 38 (2d Cir. 1987) (citations omitted).  Nothing in the Fifth Amendment

prohibits the police from merely listening to volunteered statements, and

then using those statements at trial.  *Edwards v. Arizona*, 451 U.S. 477,

485-86 (1981).

When the government contends that a defendant has voluntarily

waived his *Miranda* rights, it must prove the voluntariness of the waiver by

42

a preponderance of the evidence.  *Missouri v. Seibert*, 542 U.S. 600, 124

S.Ct. 2601, 2608 n.1 (2004) (citing *Connelly*, 479 U.S. at 169).  The

voluntariness test governing a *Miranda* waiver is essentially the same test

applicable to the due process inquiry concerning the voluntariness of

confessions themselves.  A defendant's decision to relinquish his *Miranda*

rights must be voluntary, knowing and intelligent.  Thus, relinquishment

> must have been voluntary in the sense that it was the
> product of a free and deliberate choice rather than
> intimidation, coercion or deception.  Second, the waiver
> must have been made with full awareness of both the
> nature of the right abandoned and the consequences of
> the decision to abandon it.  Only if the 'totality of the
> circumstances surrounding the interrogation' reveal both
> an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that
> Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citations omitted); *see also*

*United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997).  Factors

relevant to the totality of the circumstances are: the characteristics of the

accused, such as his experience, background, age and intelligence; the

conditions of interrogation; and police conduct, such as physical abuse,

handcuff restraint, and psychologically coercive tactics.  *Nelson v. Walker*,

121 F.3d 828, 833 (2d Cir. 1997); *Green v. Scully*, 850 F.2d 894, 901 (2d

Cir. 1988).

The first statement is admissible because it was made during the course of a routine traffic stop which was reasonable in duration, and because *Miranda* warnings were not required.  There was no police intimidation, coercion or deception, and the statement was voluntary.

The second statement, repetitive in nature, began before Miller's custodial arrest, and continued afterwards.  In its entirety, the statement consisted of volunteered remarks by Miller, obviously designed to enlist his cousin's assistance to avoid police detection of the vehicle's contents.  The statement was not in response to police interrogation.  Therefore, it was not subject to *Miranda* because Miller was not in custody when he began to speak, and because it was not the by-product of custodial interrogation when repeated after his arrest.  There was no police intimidation, coercion or deception, and the statement was voluntary.  Accordingly, the second statement is admissible.

Miller's third statement was made in response to custodial interrogation before he was advised of his *Miranda* rights, and is admissible only if it meets the public safety exception announced in *New York v. Quarles*, 467 U.S. 649.  In *Quarles*, the Supreme Court held that if

44

considerations of public safety override the failure of the police to comply with *Miranda*, otherwise voluntary statements of a defendant are admissible.  *Id.* at 651, 654-55 & n.5.  The officer's subjective motivations are irrelevant to the availability of the exception.  *Id.* at 655-56.

The facts in *Quarles* are instructive.  A woman approached two officers, reported she had been raped by an armed assailant, and said that he had just entered a nearby supermarket.  One of the officers entered the store while the other radioed for backup.  With gun drawn, the officer inside the supermarket spotted Quarles, the assailant, who fled.  Within seconds and after losing sight of Quarles, the officer stopped him, and ordered him to put his hands over his head.  At that point, there were at least three other officers in close proximity to the arresting officer and Quarles.  The officer frisked Quarles, and discovered an empty shoulder holster.  The officer then handcuffed Quarles, and without first advising him of his *Miranda* rights, asked about the gun's location.  Quarles told him.  *Id.* at 651-52.  The record was devoid of facts suggesting that the officer's subjective motivation in asking the question was to protect either his or the public's safety.  Given the absence of such facts, the underlying court declined to recognize a public safety exception.  *Id.* at 653.

45

The Supreme Court concurred that at the time of the incriminating question, there was nothing to suggest that the officers were concerned for their personal safety, *id.* at 655, and further observed that a question of this kind might be motivated by a concern for officer or public safety, or the less laudable motive of obtaining incriminating evidence.  *Id.* at 656. Regardless, the Court stated:

> "[w]hatever the motivation ... we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied ... to a situation in which police officers ask questions reasonably prompted by a concern for public safety ... The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket.  So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it."

*Id.* at 656-57 (internal citation omitted).

In *United States v. Reyes*, 353 F.3d 148 (2d Cir. 2003), the Circuit surveyed the *Quarles* exception and applied it to a buy-bust drug arrest. There, the arresting officer, armed with information that a drug dealer regularly carried a firearm, asked him, pre-*Miranda*, whether he had anything on his person that could harm him.  The dealer told him that he

46

had a gun in his jacket.  The Circuit noted that the officer had specific

information and an objectively reasonable belief that the dealer had sharp

objects or a firearm on his person, *id.* at 154, and concluded, "the arresting

officer asked ... 'questions necessary to secure [his] own safety' and was

not trying to elicit incriminating information."  *Id.* at 150 (citation omitted,

alteration in original).  However, the Circuit cautioned that the public safety

exception is a narrow one, and emphasized that the purpose "is to allow

officers 'to follow their legitimate instincts when confronting situations

presenting a danger to the public safety.'"  *Id.* at 155 (citation omitted).

Citing the facts, the Circuit emphasized that the arresting officer's

questions were limited to objects on the suspect's person, were reasonably

prompted by a concern for officer safety, and did not solely seek to elicit

incriminating evidence.  *Id.*

   The Circuit again addressed the exception in *United States v.*

*Newton*, 369 F.3d 659 (2d Cir. 2004), in the context of a home parole

search where the officers had reason to believe the parolee was in

possession of a firearm.  The specific question asked the parolee was

whether he "had any 'contraband' in the house," at a time when he was

handcuffed and in the presence of several parole and police officers.  *Id.* at

47

663.  Citing *Quarles* and *Reyes*, the Circuit observed, "[t]he public safety exception to *Miranda* does not depend upon the subjective motivation of the questioning officer.  Rather, it applies so long as the questioning 'relate[s] to an objectively reasonable need to protect the police or the public from any immediate danger.'"  *Id.* at 677 (citations omitted, alteration in original).  As to the parolee's handcuffed incapacitation and the presence of the officers, the court observed that there were still non-police officers in the apartment in the midst of a domestic dispute who could have retrieved a gun the police reasonably suspected was present.  *Id.* at 678.

The court also notes the Circuit's guidance regarding the nature of the purported public safety inquiry.  In *Newton*, the officer did not use the word "firearm" which formed the basis of his reasonable public safety concern, but instead used the word "contraband."  Recognizing that "public safety questions are framed spontaneously in dangerous situations," and that "[p]recision crafting cannot be expected in such circumstances," the Circuit stated that the exception permits broader inquiries as long as they encompass weapons or safety concerns.  *Id.* at 678-79.  While it is arguable that the exception has been interpreted more broadly elsewhere, it is clear in this Circuit that it remains narrowly circumscribed to facts

48

demonstrating an objectively reasonable relationship to public or officer safety.

Given the facts here, the court concludes that the exception does not apply, and Miller's third statement must be suppressed.  Miller's stop began as a routine traffic encounter and until Morrow found the clip in the glove compartment, there was no definitive reason to believe that Miller possessed a weapon.  There was, however, an objectively reasonable basis for Morrow to be concerned for his safety.  Within moments of the stop, Miller told Morrow that he was on his way to see his cousin, Lewis, who was then standing on the sidewalk near Miller's car.  Morrow recognized Lewis as a member of the Bloods, which he knew to be a violent street gang associated with guns and drugs.  Compounding the problem, Miller was seeking Lewis' intervention in the encounter, and Lewis continually walked toward the car despite Morrow's orders to retreat. Alone at night on an almost deserted street with a Blood and his cousin, Morrow instinctively knew there was a prospect of personal danger.  That is precisely why he called for backup.  Under those circumstances, had Morrow asked Miller whether there was anything in the car he should be concerned about, and received the same reply as did Ellis later in the

49

encounter, the court would have no difficulty applying the public safety

exception.  However, that is not how the encounter unfolded.

By the time Ellis asked the question, both he and Murray had arrived,

Miller was in handcuffs at the rear of his vehicle, and Lewis had been

approached by Ellis and told to retreat or face arrest.  Lewis had complied.

As the Supreme Court recognized in *Quarles*, an officer may have a myriad

of subjective reasons for asking a question, which is why his subjective

motives are irrelevant.  *See Quarles*, 467 U.S. at 655-56.  That does not

mean, however, that the court must ignore the reasons proffered for the

police action.  Those reasons are a part of the circumstances the court

must consider when assessing objective reasonableness.  During the

hearing, Ellis unequivocally stated that as he stood at the rear of Miller's

car with Miller in handcuffs, he had no reason for concern about his safety.

The court credits his assertion since there were two other armed officers

present, he had already subdued Lewis, and Miller was incapacitated.

Furthermore, he testified that the reason he left Miller at the rear of the

vehicle rather than place him in the patrol car where he would have been

less a risk was because he wanted to see Miller's reaction when Morrow

and Murray conducted the inventory search.[10]  In this context, his question

was designed to generate incriminating evidence, not information

concerning weapons.[11]  As the Circuit has stated, "the public safety

exception does not permit officers to pose questions designed *solely* to

elicit testimonial evidence from a suspect ... Thus, to fall within the

exception, a question must have some rational relationship to defusing the

perceived danger."  *Newton*, 369 F.3d at 679 n.8  (citing *Quarles*, 467 U.S.

at 658-59) (emphasis in original) (internal quotation marks omitted).

Accordingly, the third statement is suppressed.

The fourth statement, in essence denying ownership of the coat and

safe, was volunteered by Miller.  Because his disclaimer was spontaneous

and not precipitated by police interrogation, it was not subject to *Miranda*.

There was no police intimidation, coercion or deception, and the statement

was voluntary.  Accordingly, it is admissible unless tainted by the

---

[10]From the perspective of police safety, a court should not judge police tactical decisions made in the rapidly changing dynamics of street or traffic encounters, and the court does not do so here.  To the extent Miller argues that Ellis could have put him in the patrol car and reduced his risk of danger, the court is not persuaded that what the police could have done is a basis for analyzing objective reasonableness.  Ellis' failure to do so here is relevant because it supports his testimony that he did not perceive police or public danger at the time.  Instead, he left Miller there to see his reaction to the search.

[11]The fact that Ellis phrased his inquiry in terms of "drugs, pot, or weapons" is irrelevant to the court's analysis.  *See Newton*, 369 F.3d at 663.

51

inadmissible third.

The fifth and sixth statements were made after Miller was advised of his rights in full compliance with *Miranda*.  Given the totality of the circumstances surrounding Miller's conversations with Ellis while in Ellis' vehicle, Miller understood his rights and made an uncoerced choice to waive those rights and speak.  His decision was voluntary because it was the product of a free and deliberate choice, not police intimidation, coercion or deception.  Furthermore, his fifth statement was spontaneous, and not prompted by interrogation.  Additionally, as was true of the *Miranda* waiver itself, both statements were voluntary, and there was no police intimidation, coercion or deception.  Accordingly, the fifth and sixth statements are admissible unless tainted by the third.

The parties have never addressed four of the six statements, much less the impact of the third, now suppressed, on the last three.  Succinctly stated, the question is what impact a suppressed, non-*Mirandized*, custodial statement has on three subsequent statements that were either volunteered or made after a valid *Miranda* waiver.  The court has already determined that all six were voluntary within the meaning of the Due Process Clause, and, in any event, Miller has waived his right to challenge

admissibility on that basis.

The *Wong Sun* "fruit of the poisonous tree" doctrine, *see Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963), applicable to Fourth Amendment violations, does not preclude admission of subsequent statements in this context.  *See Oregon v. Elstad*, 470 U.S. 298, 305-09 (1985); *see also Seibert*, 124 S.Ct. at 2610 n.4 (citing *Elstad*).[12]  Instead, if proper *Miranda* warnings are subsequently administered, those warnings cure the prior deficiency and the "suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Elstad*, 470 U.S. at 311 (citation omitted).  There are no rigid rules governing the analysis such as a passage of time or break in the chain of events.  *Id.* at 317.  Instead, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made... [T]he finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.  The fact that a suspect chooses to speak after being informed of his rights is ... highly probative."  *Id.* at 318.

---

[12]An unwarned statement does not taint a subsequent search, *see United States v. Patane*, 542 U.S. 630 (2004), but an illegal search may taint a statement.  The court need not address this latter issue since it concludes that there was no illegal search.

53

Interpreting *Elstad*, the Circuit has observed that courts must

consider the totality of the circumstances concerning the statements,

including the characteristics of the accused, the conditions of interrogation,

and the conduct of the police.  *See Parsad v. Greiner*, 337 F.3d 175, 183

(2d Cir. 2003); *see also Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir.

1998); *United States v. Anderson*, 929 F.2d 96 (2d Cir. 1991).  Ultimately,

the question is whether the subsequent statements were made following a

knowing and voluntary waiver of rights.  *Parsad*, 337 F.3d at 183.

Characteristics of the accused include his comprehension of the events, his

coherence, and the appropriateness of his responses.  The conditions of

the interrogation reflect the atmosphere in which it was conducted, and

police conduct focuses on whether coercive or improper tactics were

employed.  *See id.* at 183-84.

Before turning to the *Elstad* analysis, the court must also consider

what additional limitations, if any, are imposed by the Supreme Court's

plurality opinion in *Missouri v. Seibert*, 124 S.Ct. 2601.  In this court's view,

*Seibert* limits the application of *Elstad*, but not the test.  *Seibert* held that

where a non-*Mirandized* statement was a part of a coordinated and

continuous interrogation designed to thwart *Miranda*, a subsequent

54

statement preceded by adequate warnings failed to serve the intended

function of the warnings: namely, apprizing the suspect of his right not to

speak.  *Seibert*, 124 S.Ct. at 2613.  Therefore, the subsequent statement

was inadmissible.  This Circuit has not yet addressed the full parameters of

*Seibert*, and *Seibert's* plurality opinion has generated a certain degree of

consternation concerning its precise holding.  *See United States v. Cohen*,

373 F. Supp. 2d 340 (E.D.N.Y. 2005).  Nonetheless, *Seibert* does not alter

the fundamental *Elstad* inquiry: namely, whether under the totality of the

circumstances, an accused's subsequent statements were made following

a knowing and voluntary waiver of rights.  It does entail, however, a full

consideration of factors that may bear additional relevance.  Thus, the

court should consider "the completeness and the details of the questions

and answers in the first round of interrogation, the overlapping content of

the two statements, the timing and setting of the first and second, the

continuity of police personnel, and the degree to which the interrogator's

questions treated the second round as continuous with the first."  *Id.* at 352

(quoting *Seibert*, 124 S.Ct. at 2612); *see also Vachet v. West*, No. 04-CV-

3515JG, 2005 WL 740640 (E.D.N.Y. Mar. 24, 2005).

    Considering the totality of the circumstances, including Miller's

55

behavior, the conditions surrounding the volunteered statements and the nature of Ellis' conduct and questions, the court concludes that the fourth, fifth and sixth statements were voluntary, were not tainted by the inadmissible third, and are not subject to suppression.

The court has already found that there was no police deception or psychologically or physically coercive pressures inducing Miller to speak, nor has he ever claimed any.  Although the fourth statement denying ownership of the coat and safe closely followed Ellis' earlier inquiry, it was spontaneous and not prompted by any interrogation whatsoever. Furthermore, the statement bore no rational relationship to the impermissible question that preceded it.  In other words, Miller's remark was not prompted by, or a natural continuation of, the earlier question.  His disclaimer of ownership of the coat and safe was a voluntary declaration seeking to distance himself from both, and had nothing to do with items found in the glove compartment.

The fifth and sixth statements followed what Miller essentially concedes, by waiver, was a voluntary relinquishment of his rights after full *Miranda* warnings were administered.  Miller acknowledged that he understood the warnings, and there are no facts suggesting a contrary

conclusion.  He completely understood what was occurring, he was coherent and exhibited no signs of alcohol or narcotic consumption, and his responses were appropriate.  Furthermore, the fifth statement was volunteered, and not prompted by police interrogation of any kind.  The sixth statement was prompted by an Ellis inquiry, but that inquiry was a logical question following Miller's volunteered statement, and was not a by-product of coercive or improper tactics.  Finally, the facts do not support the conclusion that any of Ellis' questions during the entire encounter were part of a coordinated and continuous interrogation designed to thwart *Miranda*. Accordingly, the motion to suppress the fourth, fifth and sixth statements is denied.

## C.  <u>The Searches</u>

Warrantless searches are *per se* unreasonable under the Fourth Amendment subject to specifically established and well-delineated exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted).  From an overall perspective, the searches of Miller's person and the entire vehicle were reasonable under two of those recognized exceptions: namely, searches incidental to a valid arrest and an inventory conducted pursuant to established and standardized policies and

procedures.  There were, however, alternative bases partially justifying the searches.  The court turns to an analysis of each.

### 1.  __The Search of Miller's Person__ (Search Incidental to Arrest)

A search incidental to a lawful arrest is one of the recognized exceptions to the Fourth Amendment's warrant requirement.  *See Chimel v. California*, 395 U.S. 752 (1969).  The police may conduct a thorough search of the arrestee and areas within his immediate control for weapons and evidence.  *Id.* at 762-63.  *Chimel* constitutes a bright-line rule, and whether the officer's safety is in jeopardy or evidence is in danger of destruction is irrelevant.  *See United States v. Robinson*, 414 U.S. 218, 235 (1973).

For the reasons already recited, Miller was validly arrested when removed from the car after the NYSPIN report, and the search of his person incidental to that arrest was reasonable.  Accordingly, the motion to suppress evidence seized from Miller's person is denied.

### 2.  __The Car Search__

Miller seeks suppression of items seized from the interior of his car, from the trunk and from a locked safe located in the trunk.  He generically

asserts that all searches were warrantless, and maintains his disclaimer that he did not own the coat and safe in the trunk.  However, he argues that he had an expectation of privacy sufficient to contest the search because he owned the vehicle and because he was the driver and sole occupant at the time of the search.  He also maintains that the inventory search was not conducted pursuant to established administrative procedures, it began before his arrest, and that an authorized search of his person did not extend to the car.

The government responds that the inventory search was valid, that the interior vehicle searches were permissible pursuant to the automobile and search incidental to arrest exceptions to the warrant requirement, and that Miller abandoned his right to contest the search of the coat and safe.

The court turns to an analysis of these, and other, arguments.

### a. **Inventory Exception and Inevitable Discovery**

An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items, and to protect against false claims of loss or damage.  *See Whren*, 517 U.S. at 811 n.1 (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)); *Colorado v. Bertine*, 479 U.S. 367, 372 (1987); *United States v.*

*Mendez*, 315 F.3d 132, 137 (2d Cir. 2002).  It is a recognized exception to

the Fourth Amendment's warrant requirement.  *Mendez*, 315 F.3d at 137.

An inventory search may not be a police ruse to rummage through a

vehicle in order to discover incriminating evidence.  *Florida v. Wells*, 495

U.S. 1, 4 (1990).  Therefore, the government must establish that the police

were following standardized procedures, or established criteria, and acting

in good faith.  *See Bertine*, 479 U.S. at 372.  It is not necessary, however,

that procedures be written, as long as they are standardized and

consistent.  *See Mendez*, 315 F.3d at 138.  An inventory search may be

performed at the side of the road or police station, and if consistent with

standardized procedures, the police may open closed containers.  *Id.* at

137 & n.3.  To prove standardized criteria, the government may rely on

written regulations or testimony concerning standard practices.  *Id.* (citing

*United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)).

Under the inevitable discovery doctrine, illegally obtained evidence is

not subject to suppression if the government can prove that it would have

been legally and eventually discovered without the constitutional violation.

*Mendez*, 315 F.3d at 137 (citations omitted).  In the context of inventory

searches, the government must prove that the police had legitimate

custody of the vehicle so that an inventory search would be justified, that inventory searches were justified by established and standard procedures, and that those procedures would have inevitably led to the discovery of the evidence.  *Id.* at 138.

Here, the court has found that the police were operating according to both written and standardized practices, including those which required an inventory of closed containers.  That finding is supported by the written procedures themselves, and the hearing testimony, including that of Lieutenant Murray who was responsible for inventory training.  While the written procedures are susceptible to a *de minimis* argument that an inventory be performed after a tow, that argument is of no moment since either locale is legitimate and the inventory would have inevitably occurred, regardless.  Furthermore, the court credits the testimony that a roadside and pre-tow search was the standard inventory practice.

Also unavailing is Miller's suggestion that the police intended a rummaging search regardless of their inventory policy.  His argument is predicated on the assertion that they began the search before they had a valid basis to do so under their regulations: namely, following a valid arrest. The court has already disposed of this argument since, as a matter of fact,

the police had validly arrested Miller before beginning the search.  Even if

the court credited Miller's argument, however, the following facts have

been established: the police had legitimate custody of Miller's vehicle;

Watervliet inventories are performed according to established and

standardized procedures; and the inventory procedures would have

inevitably led to the discovery of the seized evidence since the Troy

warrant was ultimately confirmed.  *Mendez*, 315 F.3d at 137-38.

Accordingly, the motion to suppress evidence seized from the

vehicle, including closed containers, is denied.

### b. <u>Search of the Passenger Compartment</u> (Search Incident to Arrest)

Once a police officer lawfully arrests a recent occupant of an

automobile, he may contemporaneously conduct a warrantless search of

the passenger compartment, including containers, as an incident of that

arrest.  *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 2130-31

(2004) (interpreting *New York v. Belton*, 453 U.S. 454 (1981)).  According

to *Thornton*, the arrestee may be handcuffed and incapacitated and the

police may be without probable cause to believe the passenger

compartment contains a weapon or contraband, but the search may be

62

conducted nonetheless.  124 S.Ct. at 2129; *see also United States v. Osife*, 398 F.3d 1143, 1145-48 (9th Cir. 2005); *United States v. Herndon*, 393 F.3d 665, 668 (6th Cir.), *vacated on other grounds*, 125 S.Ct. 2279 (2005); *United States v. Holmes*, 385 F.3d 786, 791-92 (D.C. Cir. 2004). The scope of the search, however, does not include the trunk.  *United States v. Perea*, 986 F.2d 633, 643 (2d Cir. 1993) (citing *Belton*, 453 U.S. at 461 n.4).

Accordingly and alternatively, the motion to suppress items seized from the interior of the car, and specifically excluding the trunk, is denied.

### c. Search of the Vehicle (Automobile Exception and Plain View)

If the police possess probable cause to believe a readily mobile vehicle contains contraband or evidence of a crime, they may conduct a warrantless search.  *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (*per curiam*); *United States v. Ross*, 456 U.S. 798, 809 (1982); *Carroll v. United States*, 267 U.S. 132, 153-56 (1925); *Chambers v. Maroney*, 399 U.S. 42, 47-52 (1970); *Gagnon*, 373 F.3d at 235.  The search authorized is limited to locations that may contain the evidence or contraband the police have probable cause to seek, but may include the entire vehicle and its

contents, including containers and packages.  *Gagnon*, 373 F.3d at 235.

As it relates to the automobile exception, the critical inquiry is whether the

police "had sufficient knowledge or reasonably trustworthy information to

justify a person of reasonable caution in believing ... there was a 'fair

probability that contraband or evidence of a crime' ...  would be found" in

the vehicle or its contents.  *Id.* at 240 (quoting *Massachusetts v. Upton*, 466

U.S. 727, 733 (1984), *see also California v. Acevedo*, 500 U.S. 565, 580

(1991).

It is clear, however, that owners and drivers of vehicles have an

expectation of privacy in the vehicle's interior.  *Class*, 475 U.S. at 114-15.

Therefore, the police may not search under the automobile exception

absent probable cause, and the assessment of probable cause,

dependent, as always, on the totality of the circumstances, is a fluid and

evolving concept.  While initial police intrusion into a car's interior may be

justified on the basis of some exception to the warrant requirement, items

located during that initial intrusion may generate additional facts warranting

the application of some other exception.  *See id.* at 116-19 (justified entry

into passenger compartment followed by plain view seizure of contraband).

The plain view exception applies if an officer is lawfully searching a place

where another object may be plainly seen, the incriminating nature of the other object is readily apparent, and the officer has lawful access to the object itself.  *See Horton v. United States*, 496 U.S. 128 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

Here, the court concludes that when Morrow first stopped Miller's readily mobile car for a traffic infraction, he had no probable cause to believe that the car contained evidence of a crime or contraband.[13]  When he placed Miller under arrest in connection with the Troy warrant and seized currency and other items from Miller's person as a search incidental to arrest, the escalating encounter still afforded insufficient probable cause to believe the car contained evidence or contraband.  Therefore, there was no probable cause justifying the vehicle search before the loaded clip was discovered in the glove compartment.

However, the glove compartment intrusion was justified as a search incidental to arrest, *Thornton*, 124 S.Ct. at 2130-31, or as an inventory search.  *Opperman*, 428 U.S. at 369; *Bertine*, 479 U.S. at 372.  The question then becomes what effect, if any, did the justifiable seizure of the

---

[13]Miller baldly states in his post-hearing Reply that his vehicle was not readily mobile.  *See Reply MOL at 8, Dkt. No. 25*.  However, he then offers no factual or legal support for his assertion.  The court need not engage in a prolonged analysis given the facts of this case.  *See Chambers v. Maroney*, 399 U.S. 42 (1970).

Case 1:05-cr-00014-GLS   Document 29   Filed 08/11/05   Page 66 of 72

loaded clip have on Morrow's probable cause to believe that areas beyond

the vehicle's passenger compartment contained evidence of a crime or

contraband: namely, a gun.  Other courts have concluded that the

presence of a bullet in the interior of a car justifies a further search.  *See*

*United States v. Ruggerio*, 824 F. Supp. 379, 394 (S.D.N.Y. 1993); *United*

*States v. Little*, 945 F. Supp. 79, 84 & n.3 (S.D.N.Y. 1996).  Under the

totality of the circumstances extant in this case, this court also concludes

that the search of the trunk and the safe were warranted under the

automobile exception after Morrow found the loaded clip.  Naturally, the

search of those areas for a gun was reasonable in scope.  Therefore, the

seizure of the gun and other evidence and contraband was justified under

the plain view exception to the warrant requirement.

Accordingly, and for the reasons stated, the motion to suppress items

found in the trunk and safe is alternatively denied because the search was

justified by  the automobile and plain view exceptions to the warrant

requirement.

### d.  <u>Search of the Coat and Safe</u> (Expectation of Privacy and Abandonment)

The government argues that Miller abandoned his right to contest the

search of the coat and safe by disclaiming ownership.  A defendant

seeking suppression has the burden of establishing that his own Fourth

Amendment rights were violated by a search or seizure.  *See Rakas*, 439

U.S. at 130 n.1 (citing *Simmons*, 390 U.S. at 389-90; *Jones v. United*

*States*, 362 U.S. 257, 261 (1960)); *Rawlings v. Kentucky*, 448 U.S. 98, 104

(1980)).

    In *Rakas*, the defendants knew that the prosecution contested their

standing to assert a Fourth Amendment violation, but never alleged

ownership of the items seized.  Given the defendants' burden of proof and

their failure to adduce any, the Court assumed no ownership.  *Rakas*, 439

U.S. at 130-31 & n.1.  In doing so, the Court distinguished *Coombs v.*

*United States*, 408 U.S. 224 (1972), which resulted in remand on the issue

of ownership where the defendants were unaware that the government

contested standing.  *Rakas*, 439 U.S. at 131 n.1.

    The *Rakas* Court observed that the notion of "standing" did not

materially advance the resolution of suppression issues, especially since

the ultimate inquiry is whether he who seeks to suppress has had his own

Fourth Amendment rights infringed by the search or seizure he challenges.

*Id.* at 133; *see also Minnesota v. Carter*, 525 U.S. 83, 87 (1998) ("standing"

doctrine rejected twenty years ago).  In this latter regard, the issue entails

two inquiries:  "first, whether the proponent of a particular legal right has

alleged 'injury in fact,' and, second, whether the proponent is asserting his

own legal rights and interests rather than basing his claim for relief upon

rights of third parties."  *Rakas*, 439 U.S. at 139 (citations omitted).  The

second inquiry is satisfied if a search or seizure infringes an interest of the

defendant which the Fourth Amendment protects.  *Id.* at 140.  This is so if

the person has a legitimate expectation of privacy in the invaded place.  *Id.*

at 143.  Furthermore, expectations of privacy may vary even as to items in

the same space invaded.  Thus, a property interest in premises may

establish an expectation of privacy in the premises, but not necessarily to

all items located there.  *Id.* at 143 n.12.  The Court concluded that the

defendants, passengers in the automobile searched, had no reasonable

expectation of privacy in the glove compartment or the area beneath the

seat.  *Id.* at 148-49.

        In *United States v. Salvucci*, 448 U.S. 83, 95 (1980), the Court

reaffirmed *Rakas*, and specifically overruled principles of "automatic

standing" that had formerly controlled suppression analysis in possessory

offenses.  The Court acknowledged that a property interest in the place

searched or the items seized is a factor in the expectation of privacy

analysis, but not itself dispositive.  *Id.* at 91-92.  In *Rawlings*, the Court

found that a defendant failed to prove an expectation of privacy when the

police searched a purse of an acquaintance, and found drugs that the

defendant admitted were his.  *Rawlings*, 448 U.S. at 106.

In *United States v. Haqq*, 278 F.3d 44 (2d Cir. 2002), the Circuit

explained the *Rakas* test as requiring a defendant to "demonstrate that he

personally has an *expectation of privacy in the place searched*," *id.* at 47

(citation omitted) (emphasis in the original), and "that his expectation [of

privacy] is reasonable, *i.e.* one that has a 'source outside the Fourth

Amendment, either by reference to concepts of real or personal property

law or to understandings that are recognized and permitted by society.'" *Id.*

(citation omitted).  The application of these principles to the facts of *Haqq* is

instructive in light of the facts here.

Haqq shared an apartment with others and had a legitimate

expectation of privacy in the apartment itself.  While lawfully searching the

apartment, the police searched a suitcase under circumstances where the

search was of questionable validity under the Fourth Amendment.  *Haqq*,

278 F.3d at 46.  The district court made no findings concerning Haqq's

legitimate expectation of privacy in the suit case.  *Id.* at 47.  Since the search of the apartment was legitimate, the Court remanded to determine whether Haqq had an expectation of privacy in the suitcase, absent which he had no basis to contest the search.  *Id.* at 51.

Here, Miller was the sole occupant of the car owned by him. Unquestionably, he had an expectation of privacy in the car and the police could not search it absent either a warrant or a reasonable basis to search without a warrant.  Accordingly, as to the general contents of the car, Miller satisfied his burden of establishing a reasonable expectation of privacy that the law recognizes outside the scope of the Fourth Amendment.

There remains, however, the question of the coat and the safe which he denied owning.  If the police intrusion into the car's general interior was reasonable on the basis of some exception to the Fourth Amendment warrant requirement, then Miller must have had some expectation of privacy in the coat and safe in order to contest the search and seizure of those items.  The government contends that Miller had no reasonable expectation of privacy because he disclaimed ownership, and in any event, abandoned them.  Thus, there were no personal property rights recognized and permitted by society.

The Circuit has consistently held that the search of abandoned property violates no privacy interest. *See Gudema v. Nassau County*, 163 F.3d 717, 722 (2d Cir. 1998); *see also United States v. Welbeck*, 145 F.3d 493, 498 (2d Cir. 1998) (repeated disclaimer of interest in bag constitutes abandonment); *United States v. Torres*, 949 F.2d 606, 608 (2d Cir. 1991) (disclaimer of knowledge and contents of shoulder bag); *United States v. Springer*, 946 F.2d 1012, 1017 (2d Cir. 1991) (disclaimer of knowledge and contents of suitcase); *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990) (same); *United States v. Moskowitz*, 883 F.2d 1142, 1147 (2d Cir. 1989) (same); *United States v. Tavares*, No. 01 Cr. 1115(JFK), 2002 WL 31571662, at *5 (S.D.N.Y. Nov. 18, 2002) (bag in car trunk).

Not only did Miller disclaim ownership of the coat and safe at the time of the police encounter, but he also reasserted that disclaimer in his suppression motion.  Naturally, the search of both can be justified only if the police had a reasonable basis to search the trunk in the first place.  For a variety of reasons, the court has concluded that the trunk search was reasonable.  Therefore, Miller has failed to satisfy his burden of demonstrating that he had an expectation of privacy in the coat and safe located in the trunk, and his motion to suppress the seizure of, and from,

71

those items is denied on this alternative basis.

## VII.  Conclusion

For the alternative reasons stated herein, it is hereby

**ORDERED** that the motion of Maurice D. Miller to suppress six statements made to the police is **GRANTED** as to the third statement, and **DENIED** as to the remainder, and it is further

**ORDERED** that the motion of Maurice D. Miller to suppress evidence seized from his person and from his vehicle is **DENIED**, and it is further

**ORDERED** that, absent a plea or, alternatively, a stipulation further excluding time under the Speedy Trial Act, the parties **shall** appear for a final pretrial conference on **August 29, 2005, at 9:00 A.M.**, and for trial commencing on **September 6, 2005, at 9:30 A.M.**

**SO ORDERED.**

Date:  August 11, 2005
       Albany, NY

Gary L. Sharpe
U.S. District Judge